Next case for oral argument would be 13-1720, Equal Employment Opportunity Commission v. Audrain Health Care, Inc. Good morning. Barbara Sloan on behalf of the appellant, Equal Employment Opportunity Commission. Since we're the fourth case, let me start by saying EEOC is challenging the summary judgment that was granted to Audrain Health Care on the commission's claim that the company violated Title VII by failing or refusing to consider David Lunsford and really any other man. Would you please speak into the microphone for me? Is that better? Yes, it is much better. Okay, I know I have a very soft voice. I apologize for that. By failing, okay, so the commission's claim is that the company violated Title VII by refusing to consider David Lunsford and really any other man for a position as circulating nurse in the operating room at Audrain. The facts here are really pretty much undisputed, but if you just look at the two briefs, the two opening briefs, you can see that the inferences that can be drawn from those facts are wildly different, and that just underscores why summary judgment in this case was so very inappropriate. The evidence is that David Lunsford, who is a nurse, asked his supervisor, Linda Brooks, who is also the hiring official for this position, whether she would consider him or consider training him for the position, and she said, essentially, no men need apply for this because I'm planning to hire a woman. So he got the picture and didn't apply. You know, this bothers me because suppose this were an all-woman's hospital, and the operating room was just for women's diseases and such things as hysterectomies and breast operations and things of that kind. It wouldn't be unusual for patients to want to have women doctors and nurses, would it? No, not at all. And wasn't, I mean, the point is, well, she said, I want a woman. We haven't got enough women to treat all the women's patients that we have, and they haven't been. That wasn't sexist in terms of, you know, men aren't qualified. It was sexist in terms of what our work is, and that bothers me to some degree. Normally, I'd say you've got a slam-dunk case with me, but this one is a little bit different, and that's why I have trouble, and if you can get me over that, I'm fine. I do understand that concern, Your Honor. We definitely do, and that's exactly what the BFOQ defense is for. Yeah, but you can have reasons without having a BFO. You know, in a hospital, there are men and women, and you've got to have some kind of a balance for your patients. It's not a bona fide employment situation, but it does affect who you hire and how you hire. Well, the evidence here was that about 50% of the patients were women, which means that 50% of the patients were men, and about 25% of the statistics are kind of iffy, but the only evidence is that about 25% of the cases involved personal issues for women. Of course, we don't know how many of them involved personal issues for men, and having male circulating nurses might be very helpful for the men. They had essentially a quota of one in this case. Ms. Brooks said, you know, the doctors don't want any more women nurses. We've got one, and we've got one man, but they don't want any more men, and it's too hard for me to do the scheduling, too. If the company could show that being a woman was a bona fide occupational qualification for this job, but it is their burden, then they could have an explicit exclusionary rule like this, but they disavowed the BFOQ defense here, and all we have left then is just their justification. Well, we're concerned about patients. I can understand being concerned about patients, Your Honor, but the statute says if you have an exclusionary rule like this, you can defend it with a BFOQ, and that's Johnson Controls as well. Having a good motive doesn't justify an exclusionary rule unless it's a BFOQ, and the company here has disavowed the BFOQ, and in fact it's interesting. The EEOC prosecuted this case in district court? Yes. And as I tell you, it was the local office. Right, the St. Louis office. I just came in for the appeal. Do we have an adverse action here, though, given that he subsequently said, hey, I don't want to work for Brooks, I think is her name? Yes, we do have an adverse action. The court was wrong in saying that there was no adverse action because the court misidentified the decision. The decision here was not a refusal to hire. It was a refusal to consider a denial of any opportunity even to compete for this position. That is a violation of Title VII if that's what the jury finds happened here. Who would do the hiring and firing? Ms. Brooks would. She was the hiring official here. Wouldn't it be the hospital personnel? I think Ms. Brooks had a voice in it, but I don't think she did the hiring, or did she actually? She did. She was the hiring official. That is not disputed. The application process, had Mr. Lunsford gone through the application process, he would have submitted an application through HR, but the applications that HR approved would go to Ms. Brooks, who would have made the hiring decision. She was the hiring official, and she had decided. Is he still working for the hospital? That I don't know, Your Honor. I don't know. I do not believe that she's still in the position she was in at the time. I think she may have stepped down from that. No, is he still working? Oh, yes, he's still there. I'm sorry. Yes, I do know that. There's a refusal to hire, and that's the adverse action. All right, if we decided, you know, he hadn't been trained, let's say we would agree with you that he should have been considered, what remedy would he have now? He wasn't hired. He's still working. Would there be any more remedy in saying they must consider his application? I think it's important to remember that the commission here is the plaintiff. Lunsford is not the plaintiff. I know the commission is, but it's for the benefit of the plaintiff. We're the plaintiff. I know the commission, but this action is on behalf of the nurse, the male nurse. Well, it's very important to remember that if there's no relief, or, excuse me, if he weren't able to have the job, which is a jury question, I would say, that's a question of not a question of liability. That's a question of relief. And the relief he could get would be, for example, damages. Now under Title VII. He isn't trained. She didn't have to train him. No, she didn't. So he isn't trained. He wasn't qualified. And it might be that he was still working, so it's not a question of being out of work. Maybe he should go back to where he was and put in his application if he wants to. Well, he was working part-time, and this was going to be a full-time position. So there was a definite advantage to having this particular position. Also, we don't agree that he was necessarily unqualified or ineligible. He met the minimum qualifications for this job, or at least a jury could find that. He had the job announcement, had a list of all the requirements for the position, and even Ms. Brooks said he satisfied those. Well, the situation we have here from a remedy standpoint is simple. He never applied, and the person who got the job was the person who had the job previously, so she would be better qualified even if he had applied. But, Your Honor, number one, they weren't back-to-back decided. She came back months later. It's not as though that they were looking at the two applicants and said, oh, she's better qualified. But more importantly, Your Honor, what was in Ms. Brooks' mind at the time she talked to him? The evidence is that what was in her mind was gender, gender, gender. It wasn't qualifications. It wasn't eligibility. This is an exclusionary policy that, from the Commission's viewpoint, is damaging. We can't have these kinds of exclusionary rules. If nothing else, we're entitled to injunctive relief. To have an adverse effect, doesn't he have to take every reasonable step to attempt to get the job? No, Your Honor. That's a different test. Under the Teamster's test, if a non-applicant reasonably believes that it would be futile to apply because of information he or she has about the employer's exclusionary policies or their discriminatory bias, they're excused. Okay, so you're arguing that it was futile. It was futile. She told him. Are you familiar with our Enbank Lockridge case? Lockridge? Lockridge? Yes. Yes, of course. Okay. And there, didn't we say that in the absence of consistently enforced or gross and pervasive discrimination, that's required to make it futile? Your Honor, I don't read the case that way. I think if the company says, we are not taking any male applicants for this position, a male interested in the position can reasonably conclude it would be futile for him to apply. I don't think that Lockridge precludes that interpretation, nor could it, because that's what Teamster said, and Teamster's is a Supreme Court case. Well, Lockridge postdates Teamster's, doesn't it? Yes, but Teamster's, Your Honor, is a Supreme Court case. And anyway, if you look at, for example, the Culpepper case, which I have to say I don't know if it predates or postdates Lockridge and Culpepper, they first look at was this person deterred. They conclude he was, but not by discrimination. And then they look at this all reasonable efforts. And that only makes sense, Your Honor. A really, really effective exclusionary rule would preclude victims. Why go through the motions of applying when it's clear that the hiring official just told you she's not going to take you because you're a man? That can't be what Lockridge meant, and those weren't the facts in Lockridge. Are you claiming this is overt discrimination or covert discrimination? Overt, Your Honor. That's what the BFOQ applies. Pardon me? Overt. It's not a McDonnell-Douglas case? Not at all, although we could satisfy the McDonnell-Douglas framework if we had to. But this is a direct evidence case. She said we're not going to, you know, don't bother applying because you're a man and I'm going to hire a woman. Well, I was under the impression from the police that this lady was not, she had a voice in the hiring, but she did not actually hire this woman. She was the ultimate decision maker, Your Honor. Okay. But the application process would have gone through HR had Mr. Lunsford not been deterred from applying by Ms. Brooks' decision that she wasn't going to hire a man. Assuming for the sake of argument that Lockridge does require consistently enforced or gross and pervasive discrimination before it can be found to be futile, is there any evidence that would rise to that level? I would say this is gross and pervasive, Your Honor. Is there evidence that it happened more than once? No. So how is it gross and pervasive? Well, it's certainly gross. Okay. Or pervasive. Gross or pervasive. There you go. Yes. I mean, it can't be that this court would say that if an employer explicitly puts up a sign that says no whites need apply or no blacks need apply or no men need apply, that people have to go through the motions of submitting an application just to be rejected. That's the whole point of the teamster's analysis. And I only have 20 seconds left, so I'd like to save a little for rebuttal. We'll give you a couple minutes. Okay. Do you have another question? Well, I was going to say if you just had a men's hospital where all they did was make a man infertile and the doctors were all male and the woman doctor wanted to get in and they said, well, we will operate only on males and we don't think our patients would approve, would that be actionable, do you think? I think if the employer could prove that the privacy concerns surrounding having a same-sex doctor that all of their patients wanted. Well, isn't this what we have, is a privacy concern where she said, I won't train you? Privacy can be a BFOQ, Your Honor, but it's the employer's burden to prove that. And this employer disavowed a BFOQ defense. Well, you're saying BFOQ, and I'm saying just a privacy concern as a reason, not a BFOQ in all circumstances. Well, BFOQ. In some circumstances. BFOQ. Privacy concerns can be a BFOQ in appropriate circumstances. I know it can be, but I'm saying, can it be a concern even though it's not a BFOQ? It can be a concern, Your Honor, but the statute doesn't provide a defense for that and that's pretty much the Johnson Controlled case where in Johnson Controls they said a good motive doesn't preclude you from having to show BFOQ. Thank you, Your Honor. I'll try to make it so you can hear the short person too here. Okay. Good morning, Your Honors. Tracy Young, I'm here for the Apo Lee, which is Audrain Medical Center. And I think that obviously here we agree with the district court's decision and we're asking this court to affirm the district court's decision. There is an issue I think that's central to both what Judge Bright and Judge Grandeur have talked about today, which is that there is not a pervasive culture against male nurses either in this hospital or even in this department. In fact, the OR at the time, it's in the record, there was a male nurse in the OR department at the time. It wasn't that Ms. Brooks felt that hiring a man would be hiring somebody that was unqualified. The BFOQ here was that, in fact, he didn't have the training or the experience that he needed for the position that he was hiring for. This becomes clear when you just look at the base fact that he approached her to ask her if she would train him. He didn't approach her to say, would you consider hiring a man? His concern was, would you consider hiring somebody who didn't... That's not what the district court decided. It wasn't on that basis. The district court said, you succeeded because there was no application. The district court, there was a layer of ways that they found in our favor. It's a really complicated way of saying it. Ultimately, they did find that there was no adverse employment action as an initial matter. Again, I believe that that's absolutely true. Why wouldn't it have been futile for him to apply? I think that, again, number one, you don't have the pervasive culture or gross statements against hiring men. In fact, she didn't say men need not apply. That's how her statements are being characterized for the purposes of this appeal. We certainly do admit that what she did say was that she was hoping to hire a woman for this position, that she wanted to hire a woman, and it was in order to take care of patient concerns. Was she the hiring person, as was said? She, at best, was one of the decision-makers. She ultimately did have input as to whether or not somebody was going to be hired. She was one of the decision-makers. Right. Really, her role as a decision-maker would not have come into play at the time that this remark was made to Mr. Lunsford. He would have first had to go through HR. It's part of the reason that we say this isn't an employment action is because he never would have gotten to the point where she was deciding whether or not that she wanted to hire him. At the point that he would have gone through HR, number one, she had made it clear to Audrain that what she needed for the OR at that time was an experienced OR person. In fact, a woman had previously applied to the position and been turned down for exactly that same reason, that she didn't have any experience in the OR. Wasn't there also evidence in the record, though, that some people had been trained for new positions that they didn't necessarily have the experience for? Certainly. She had previously trained people when they didn't have experience for, but that isn't to say that she had the luxury of being able to do that all of the time, and that in this particular case, she listed that as a top priority to Audrain as to what she wanted in this position. The record doesn't reflect whether it was because she didn't have time, she didn't have an interest in training somebody, whether she didn't have enough trained OR nurses to be trained, having yet another lesser-trained nurse within the rotation. None of that's in there, but all of those are possible. She certainly wasn't required to accept somebody that didn't have any training, and she did express to Audrain that that's what she was looking for. I think that it is undisputed that he didn't have the necessary training. There is some dispute as to the one disputed statement of fact as to whether or not he was even eligible because of the transfer issue, that he had previously accepted a transfer to a different department. And there it was only that there's still recognition that he would have had to have an exception to that policy in order to, again, receive a transfer so quickly after having just accepted another transfer. But here there's really no realistic dispute that he had the necessary training to step into the OR as a nurse, and that is a BFOQ. I mean, that here, you know, it is something that she was looking at and had a legitimate reason to look at. He recognized that, and his statements to that are in the record. Do you agree that this case involves direct evidence? I do agree that to the extent that the court's going to analyze it, it would be better under Price-Waterhouse, that that's the case that the EEOC has made. Obviously, we don't believe that it qualifies, but I think that unquestionably, McDonald-Douglas doesn't apply to this case. You know, sort of throughout the prima facie, he didn't apply. He wasn't replaced by an equally qualified person. The person who was ultimately hired for this had 11 years of OR experience and actually had experience in that OR. She was able to step in and hit the ground running, as it were. And so for that, I think McDonald-Douglas, I believe that we're on the same page on that, that it simply is not an issue in this case. So you read Lockridge to require gross and pervasive discrimination before a finding of futility? I do. I also think that under... Is that inconsistent with Teamster? I don't think that it is inconsistent with Teamster's. And again, I think that you have to look at the situation where, on a practical level, of whether an employee is going to decide that it's futile or not. Here, he didn't go through the proper channels. I mean, he knew how to apply for a position or a transfer to a position that he was qualified for. He went to HR, he filled out a transfer application for just such a position weeks before the conversation that we're talking about now. And again, you have a situation where there was another male nurse in the ER already. And on top of all of that, even if you don't say that it raises to the point of gross and pervasive, you have that Ms. Brooks's supervisor approached him afterwards, after learning that he may have some interest in the OR position, and asked him, Are you serious? Do you want for us to consider you? And he said, No, I don't want to work with her. She doesn't have good leadership skills. And so I think here, it's to say that he approached her when he wasn't supposed to. It's clear in the policy, the transfer policy, that the employee is directed not to contact the supervisor for the department that he wants to go to. She made a statement, and then he dropped it, and that's it. And again, it goes to the, What are his damages? I mean, what can Audrain do at that point? I mean, she said something that, you know, arguably could have discriminatory animus, but it doesn't have. It's not a decision. It's not a decision by Audrain. One of the important things is that once Ford went to Carrie Wilson, Vice President of Criminal Services, and said, I don't want to work with this nursing officer, Brooks. So, you know, that sort of looks like he decided not to apply, that he made that decision. Right, and again, I think that that's what we're talking about, that we don't even get to the level of discussing gross and pervasive because, I mean, he effectively pulled his interest. You know, it's, yeah, it's, I mean, and again, you know, at that point, what was Audrain to do? You know, he clearly expressed to her supervisor when directly asked that he didn't have an interest in working for her. You know, I mean, so at that point, you know, what was there left for the employer to do? And so I think that what you have is you have a remark that we obviously wish had not been made during a conversation that should never have been held from an employee that was unqualified for the position that he was considering, that he was, in fact, ineligible, which, you know, again, we haven't touched on this specifically, but he had accepted a transfer to another unit. Now, before he was transferred to that other unit, he was aware that the OR position was available. You know, he could have applied for both. That was within. The same lady approved the transfer. Ms. Brooks approved his transfer. Yeah, she approved his transfer, which, again, that's what her role is, you know, to get to what you were saying of her being one of the decision makers is after the initial process of HR, it is then sent out for approval for the different supervisors, and they do have the right to approve it. And she approved his transfer to another department, and only after that did he then approach her about her willingness, again, to train him to go into the OR. So I think that, you know, again, under those circumstances, what you're talking about isn't what the EOC is trying to characterize this as. I think that it is a remark by somebody who, at best, is one of the decision makers in the process whose role would not have been in place at the time. So you don't. It's not true that you are. Who was the trial lawyer for the EOC? I'm sorry. I couldn't hear you. Who was the trial lawyer? Do you know? I apologize. I don't know who the EOC trial lawyer is. I don't know the name. I apologize. I know it was somebody in the local St. Louis office, and, again, I had trial counsel. I wasn't in the trial court either. I think you're stuck with the appellate counsel on this one. Is it in dispute whether Ms. Brooks was a decision maker? Is that a dispute between the parties? There's a dispute to an extent. We don't believe that she was the decision maker. I don't know whether, in some ways, the EOC does seem to characterize her as the decision maker. She was the hiring official for this particular circumstance. However, there were other people that had the ability to turn down his application before it ever got to her. And, again, the fine line that we're trying to point to is that while she was one of the people, at the point that this conversation was held, she was not yet acting in that. She didn't have the authority. She couldn't have said, yes, I will train you. You're hired. And I don't think anybody agrees to that. She couldn't have said, no, you're not hired. I reject your application, and it's done, if he had somehow verbally made the application to her or if we tried to consider this that in order to consider an adverse employment decision. At this point, she didn't have the authority to do either one because Audrain had a system whereby people could transfer, and he wasn't in that system yet, and he hadn't gone through the steps necessary in order for her to be able to approve or disapprove of his application. If there was an adverse action here, and you're saying he wasn't eligible because of the transfer policy, but wouldn't the EOC still be entitled to injunctive relief and maybe attorney's fees? Here we're not. The relief that was sought isn't injunctive relief. It was monetary relief for the employee. That's solely what was sought? As far as I'm aware. And I'm wrong. I apologize. I have my trial court and the trial counsel and the thing. Then if you want to go to the level of, again, saying, well, the EOC can seek injunctive relief, then you're into an entirely different area than what could be proven by the record. And so here I don't think the record would support the EOC receiving injunctive relief either, simply, again, because this isn't a pervasive action. This isn't something where she felt that male nurses were unqualified or that Audrain, more importantly, felt that male nurses were inherently unqualified. You're talking about a single decision where she's looking at patient concerns and staffing issues that she had in one particular department. I'm kind of curious. I don't know if you probably don't have to answer this, but is there a reason why this wasn't defended under BFOQ? Honestly, I don't know the answer to that question. And my impression from just reading through the record and everything is that we didn't reach it, you know, that it wasn't something that they got caught up in the initial analysis of that there wasn't an adverse employment action, that he wasn't qualified, that he was ineligible. And so to go through all of that and then also say that, you know, whether or not his gender was a BFOQ was one too many. But don't hold me or my child to account for that later because that's my impression off the top of my head. So unless the panel has any more questions, all right. Thank you, Your Honor. Ms. Sloan, you used your time, but since we were mostly questioning you, we'll give you a couple minutes in rebuttal. I wanted to focus first on the deterrence. Yes, I'm sorry. Is that better? The evidence is pretty strong that Mr. Lunsford was deterred from applying. He was what? He was deterred by the futility of it. He said, I don't want to work for Brooks anymore. I have no respect for her leadership in light of what she said. The two hiring officials that he approached, they did not approach him. He approached them. Both agreed that he had changed his mind after talking to Brooks because she told him that she was going to hire a woman, and he was mad about that. He said he wasn't going to file an internal complaint because why bother applying for the job again? They weren't going to hire him anyway since he wasn't a woman. And as I said, everyone acknowledged he changed his mind. He wanted the job, and then he changed his mind because of what she said to him. I also want to stress that the Commission does have an enforcement interest here. It's important. We've always asked for injunctive relief. But does that make it futile when he changes his mind? Well, she told him she was going to hire a woman. If he persisted in it and gone to the supervisors and said, I really want this job, maybe it would have been reversed. Maybe the decision would have been reversed. Maybe, but I think it is we don't know that.  Audrain has never disavowed this exclusionary rule. They've never said, I can't believe she made this statement. None of the supervisors ever said to him, oh, no, that was a mistake. No, no, that's not the rule. Of course we consider men and women equally. They never disavowed this. So please reverse. Very well. Thank you. We appreciate your arguments. It's an interesting case, and we'll issue an opinion in due course. Does that complete our calendar?